UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**Dr. AMIR KAKI, M.D**., *an individual,*
and **Dr. MAHIR ELDER, M.D**., *an individual*,

      Plaintiffs,

vs.

**TENET HEALTHCARE CORPORATION**,
*a foreign for-profit corporation*, **VHS, INC.,** *a foreign
for-profit corporation,* **VHS OF MICHIGAN, INC**,
*a foreign for-profit corporation,* d/b/a Detroit Medical
Center ("DMC")**,VHS HARPER-HUTZEL
HOSPITAL, INC.**, *a foreign for-profit corporation*,
**VHS SINAI-GRACE HOSPITAL, INC.**, *a foreign
for-profit corporation,* **VHS DETROIT RECEIVING
HOSPITAL, INC.**, *a foreign for-profit corporation*,
jointly and severally, (Collectively DMC and/or TENET)
and **DR. ANTHONY TEDESCHI**, President of VHS OF
MICHIGAN and CEO of DMC, *an individual*, **SCOTT
STEINER**, CEO of HARPER UNIVERSITY HOSPITAL,
DETROIT RECEIVING, AND HUTZEL HOSPITAL,
*an individual*, **ERIC EVANS**, PRESIDENT OF TENET
HOSPITAL OPERATIONS, *an individual*, **CONRAD
MALLET**, CEO SINAI-GRACE HOSPITAL, *an individual*,
and **JOHN LEVY**, JOINT CONFERENCE COMMITTEE
CHAIR, *an individual*.

      Defendants.

Case No: 19-cv-10863
Hon. Arthur J. Tarnow
Mag. David R. Grand

> **FIRST AMENDED
> COMPLAINT AND
> DEMAND FOR TRIAL
> BY JURY**

_____

**DEBORAH GORDON LAW**
**Deborah L. Gordon (P27058)**
Attorney for Plaintiffs
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, PLLC**
Thomas R. Paxton (P36214)
Sharon Rae Gross (P42514)
Attorneys for Defendants
34977 Woodward Avenue, Suite 300
Birmingham, Michigan 48009
(248) 593-6400
thomas.paxton@ogletree.com
rae.gross@ogletree.com

NOW COME Plaintiffs, DRS. AMIR KAKI and MAHIR ELDER, by and through their attorneys Deborah Gordon Law, and complain against Defendants as follows:

## A. PARTIES, CLAIMS AND JURISDICTION

1.      This is an action for violations of the retaliation provision of the False Claims Act, 31 U.S.C. § 3730, and the Michigan Medicaid False Claims Act, MCL § 400.610c; retaliatory discharge and retaliatory removal of clinical privileges in violation of Public Policy of the State of Michigan; for claims of False Light; violation of the Bullard-Plawecki Employee Right to Know Act, MCL § 423.501, *et. seq*.; Tortious Interference with Business Relationships and Expectancy; and Intentional Infliction of Emotional Distress.

2.      Plaintiff Dr. Amir Kaki, M.D., ("Plaintiff," "Plaintiffs," or "Dr. Kaki"), is a current resident of the County of Oakland, State of Michigan.

3.      Plaintiff Dr. Mahir Elder, M.D., ("Plaintiff," "Plaintiffs," or "Dr. Elder"), is a current resident of the County of Wayne, State of Michigan.

4.      Defendant TENET HEALTHCARE CORPORATION, INC., ("Tenet") is a foreign for-profit corporation, incorporated in Nevada and headquartered in Dallas, Texas.  It is a multi-national, investor-owned healthcare services company.  As of December 2018, Tenet operated 68 hospitals nationally.

1

Tenet does business, and has numerous subsidiaries it operates and controls, in the State of Michigan.

5.   VHS OF MICHIGAN, INC., a wholly-owned subsidiary of VHS, Inc., is a foreign for-profit corporation, incorporated in Delaware and doing business in Detroit, Michigan as The Detroit Medical Center ("DMC"), a Michigan corporation with its principal place of business in Wayne County Michigan.  In 2013, Tenet purchased VHS of Michigan.

6.   VHS HARPER-HUTZEL HOSPITAL, INC., a foreign for-profit corporation, incorporated in Delaware, is part of the DMC, doing business in Michigan as Harper-Hutzel Hospital (comprising Harper University Hospital, Hutzel Women's Hospital, the CardioVascular Institute and DMC Surgery Hospital).   In 2013, VHS HARPER-HUTZEL HOSPITAL, INC. became a subsidiary owned by Tenet.

7.   VHS SINAI-GRACE HOSPITAL, INC., a foreign for-profit corporation, incorporated in Delaware, is part of the DMC, doing business in Michigan under different names, including Sinai-Grace Hospital and DMC.  In 2013, VHS SINAI-GRACE HOSPITAL became a subsidiary owned by Tenet.

8.   VHS DETROIT RECEIVING HOSPITAL, INC., a foreign for-profit corporation, incorporated in Delaware, is part of the DMC, doing business

2

in Michigan under different names, including among others as Detroit Receiving Hospital and DMC. In 2013, VHS DETROIT RECEIVING HOSPITAL, INC. became a subsidiary owned by Tenet.

9.     Defendant Anthony Tedeschi ("Tedeschi") is a licensed Medical Doctor. Tedeschi has been the Chief Executive Officer ("CEO") of the DMC since January 2017.   Tedeschi previously served as the CEO of the Chicago Market of Tenet.  He is a resident of the State of Michigan.

10.     Defendant Scott Steiner ("Steiner") was the CEO of the adult DMC hospitals beginning in 2012 and ending on February 8, 2019.  He is a resident of the State of Michigan.

11.     Defendant Eric Evans ("Evans") was the President of Hospital Operations for Tenet from approximately March 2016 to December 2018. He was previously the CEO of the Texas Region for Tenet from approximately April 2015 to March 2016.  He is a resident of the State of Texas.

12.      Defendant Conrad Mallet Jr. ("Mallet") has been the CEO of Sinai-Grace Hospital since August 14, 2017.  He is a resident of the State of Michigan.

13.     Defendant John Levy ("Levy") serves as Chair of the Joint Conference Committee at the DMC, overseeing in part doctor clinical privileges. He is a resident of the State of Michigan.

3

14.    The Court has federal subject-matter jurisdiction in this action pursuant to 28 U.S.C. §§ 1331 and 2601 *et. seq*., and 29 U.S.C. § 794(a) because the complaint states a claim that arises under the laws of the United States. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 USC §1367 because these claims are so related to the federal claims in this case that they form part of the same case or controversy.

15.    Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), as it is in the district in which Defendants conduct business.

## B. FACTUAL BACKGROUND

### Parties

16.    Plaintiff Dr. Kaki is a cardiologist specializing in nuclear cardiology, internal medicine and interventional cardiology. He was a Clinical Associate Professor of Medicine at Wayne State University School of Medicine and an Assistant Program Director of Interventional Fellowship at Wayne State University School of Medicine. Dr. Kaki has had staff privileges at the DMC since 2012.

17.    In January 2014, Dr. Kaki was appointed as Director of the Cardiac Catherization Services Unit ("CCSU"), a leadership position, at the new "DMC Heart Hospital" located at VHS Harper-Hutzel Hospital, opened in 2014.

18.    The DMC Heart Hospital is in the center of Detroit, where there are

4

extremely high rates of heart disease, heart failure and high blood pressure.

19.     The DMC Heart Hospital features the full range of heart specialists: cardiologists, cardiac surgeons, vascular surgeons, pediatric cardiovascular surgeons and a nursing team that is cross-trained for any emergency or elective procedure.

20.     In his role as Director, Dr. Kaki reported to Defendants Tedeschi, Steiner and non-party, former DMC President, Ted Schreiber.

21.     In 2018, Dr. Kaki was also appointed as Director of the Anticoagulation Clinic, a leadership position at the Heart Hospital.

22.     Dr. Kaki is renowned for many high-risk procedures and vascular access techniques, is a pioneer in the area of mechanic circulatory support, and has published original manuscripts related to large bore vascular access and the use of mechanical circulatory support in high impact peer review journals.

23.     Dr. Kaki was nominated and completed the Tenet Leadership Academy. This program identifies talented leaders to be groomed for future roles. Dr. Kaki was recruited from Cornell Medical School by City of Detroit Mayor Michael Duggan and then DMC President Dr. Ted Schreiber to become employed as set forth above.

24.     Plaintiff Dr. Elder is an interventional cardiologist who specializes in

cardiology, endovascular cardiology, nuclear cardiology, internal medicine and interventional cardiology.

25.     Since 2008, Dr. Elder was appointed to the leadership positions of Director of the Cardiac Care Unit, Ambulatory Services Program, the Cardiac CT Angiogram, PERT program, Carotid Stenting program and Endovascular Medicine at the DMC Heart Hospital.

26.     In his role as Director, Dr. Elder reported to Defendants Tedeschi, Steiner and non-party, former DMC President, Ted Schreiber.

27.     Since 2007, Dr. Elder held other titles including Clinical Professor of Medicine at Wayne State University School of Medicine, Assistant Program Director of Interventional Fellowship at Wayne State University School of Medicine and Clinical Professor of Medicine at Michigan State University.

28.     Dr. Elder was voted "Teacher of the Year" for 10 consecutive years by DMC cardiology fellows.

29.     Dr. Elder was named "Top Doc" in Hour Detroit Magazine, as voted by his peers, for years 2012 through 2018 and nominated for this title for 10 consecutive years.

30.     Dr. Elder was twice awarded the distinction of Crain's "Health Care Hero" in 2011 and 2017.

31.     Dr. Elder has also been honored by local churches and community organizations for compassionate care.

32.     Dr. Elder was the primary investigator of multiple national clinical trials that brought research recognition to the DMC.

33.     Dr. Elder is a national pioneer in treatment of patients with Pulmonary Embolism disease ("PE"), and started the first PE response team in Michigan.  He is one of the leaders in PE research in the nation.  He has co-authored books and chapters regarding this disease.

34.     Plaintiffs are known and recognized for helping build the nationally-acclaimed programming for the DMC Heart Hospital beginning in 2010.

## For-Profit Tenet Buys DMC and Continues its Focus on Profit at the Expense of Patient Care

35.     Defendant Tenet owns for-profit hospitals throughout the country.

36.     In 2013, Tenet purchased VHS, Inc., and owned DMC when the Heart Hospital opened its doors in July 2014.

37.     Much of the money that Defendants Tenet and DMC receive comes from state and federal Medicare and Medicaid funds. Those funds are regulated pursuant to state and federal law.  Medicare and Medicaid fraud is a crime.

38.     Tenet has a history of violating the law in order to enrich the company, its owners and Tenet hospitals.

7

39.     In 2006, Tenet agreed to pay the Department of Justice ("DOJ") $725 million to settle allegations of illegal Medicare payments to Tenet hospitals and entered into a 5-year corporate integrity agreement that required the company to provide financial reports to the government.

40.     In 2012, Tenet agreed to pay $42.75 million to resolve allegations that it violated the False Claims Act by overbilling Medicare.

41.     In September 2016, Tenet entered into a "Settlement Agreement" and No Prosecution Agreement ("NPA") with the United States and certain states. It agreed to pay a $514 million dollar fine for engaging in healthcare fraud by making false claims for public funds under a kickback scheme relating to certain alleged medical services.

42.     In addition, in January 2017, the DOJ indicted the Tenet Healthcare Senior VP of Operations, John Holland, on four counts of fraud. The indictment states that Holland and others were part of a larger scheme to "unlawfully enrich themselves, Tenet, and the Tenet Hospitals" by engaging in fraud. Specifically, Mr. Holland sidestepped Tenet's internal accounting controls to bribe clinicians and pay illegal kickbacks to clinics in Georgia and South Carolina that referred pregnant patients on Medicaid to Tenet hospitals. The scheme allegedly helped Tenet bill Medicaid programs for more than $400 million.

43.     In September 2017, several more charges were brought against Mr. Holland. The latest indictment charged Holland with conspiracy to violate the federal Anti-Kickback Statute, wire fraud and falsification of books and records.

44.     As part of the various agreements Tenet has entered into with the government, they are required to "self-report" any violations of law or regulations and any questionable conduct.  Senior management, including these Defendants, has failed to do so and has blatantly allowed legal violations to occur in order to generate more income by cutting medically necessary support and services and allowing unnecessary medical procedures, among other things.

45.     Under the Tenet Healthcare Corporation's Quality, Compliance and Ethics Program Charter ("Charter") updated on February 28, 2018, Defendant Tenet **shall report to its respective compliance officer**, among other things,

> "(i) A violation of the obligation to provide items or services of a quality that meets professionally recognized standards of health care where such violation has occurred in one or more instances and presents an imminent danger to the health, safety or well-being of a federal health care program beneficiary or places the beneficiary unnecessarily in high-risk situations;
>
> \*               \*               \*
>
> (iii) Evidence or allegations of actual or potential violations of the federal or state Anti-Kickback laws, the federal Start Law, the state self-referral laws, or other criminal, civil or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;
>
> (iv) Violation of other federal or state laws or regulations for which

9

significant penalties may be assessed or which may subject the Tenet entity to significant litigation risk (e.g., consumer protection laws, securities laws, environmental protection laws, etc.);

                \*             \*           \*

(vi) Violation of the provisions of the NPA;

(vii) Material violation of Tenet policies;

                \*             \*           \*

(x) Any other event likely to cause significant reputational or financial harm to any Tenet entity."

46.      Tenet has been very clear that its sole goal is to make a profit, as stated publicly by Tenet CEO Ron Rittenmeyer:

"We're in the business to make a profit – number 1 … That's our job, so we're always going to be looking to reduce costs. That's just the facts."

47.      Defendants' improper and fraudulent conduct includes, but is not limited to:

    a.  Operating and billing Medicare and Medicaid for procedures knowing that the surgical equipment used in many procedures were not sterile;
    b.  Knowingly putting patients at risk of contracting life threatening diseases;
    c.  Knowingly submitting claims for payments to CMS and the State of Michigan that were false and/or fraudulent; and
    d.  Knowingly allowing physicians to conduct medically unnecessary procedures.

### Plaintiffs Report and Refuse to Acquiesce in Violations of the Law Which Compromised Patient Safety

48.      Throughout the course of their employment, Plaintiffs reported

10

multiple, significant violations of the law at Defendant hospitals to Tenet legal, Tenet compliance, DMC leadership, and Defendants Tedeschi and Steiner, which included, but were not limited to, suspected health care false claims and fraud that involved improperly claiming Medicare and Medicaid monies. Plaintiffs refused to acquiesce in these violations. This reporting and failure to acquiesce reached a head in 2018, leading to the terminations of Plaintiffs.

### 1. Unsterilized Tools

49.     On multiple occasions, Drs. Kaki and Elder reported that physicians had opened up sterilized surgical instrument packages only to find unsterile, dirty instruments, some with visible tissue and blood. Defendants failed to correct the problem, while claiming that they would do so.  The last time Plaintiffs made such a report was approximately one month before they were terminated.

50.     Dirty and unsterile surgery equipment and labs put patients at risk of contracting fatal infections which are hard to link back to hospital failures such as:

   a.  HIV;
   b.  Hepatitis B and C;
   c.  MRS (methsillin resistance staphylococcus aureus);
   d.  Fungal infections;
   e.  Pseudomonas pneumonia;
   f.  Creutzfeldt-Jakob disease;
   g.  Surgical site infections and more.

51.     After Plaintiffs were terminated on October 1, 2018, Defendants

11

falsely made representations to the public that their facilities and instruments were sterile.

52.     After Plaintiffs were terminated, due in pertinent part to their complaints, the federal Centers for Medicare and Medicaid Services ("CMS") ordered inspections of Defendants Detroit Receiving Hospital and Harper University Hospital.

53.     CMS recently informed both DMC hospitals that they are now subject to unannounced inspections by the Michigan Department of Licensing and Regulatory Affairs.

54.     CMS has informed the DMC that federal funding for Harper and Detroit Receiving hospitals will be ended if the problems with unclean surgical instruments are not fixed.

55.     Defendants continued to operate and bill Medicare and Medicaid for procedures knowing that the surgical equipment being used was not sterile and that patients were at risk of contracting life-threatening diseases.

### 2. Cuts to Services Adversely Affecting Patient Safety

56.     Defendants unilaterally made cuts to staff and services without physician input, which compromised patient safety and at times led to unnecessary deaths and/or an unsafe environment for patients.

12

57.     In the spring of 2018, Defendants, without advance notice to or consultation with the medical leadership, removed the life-saving Stat Blood Lab from the Cardiac Catherization Unit ("CCU") as a cost-cutting measure. This created an immediate and serious patient safety issue, as time is of the essence in receiving blood work results for cardiac patients.  In fact, one patient died because his high potassium levels were not reported to the cardiac team for hours.

58.     Plaintiffs met with Defendants Tedeschi and Steiner, among others, to insist that the Stat Blood Lab immediately be returned to the CCU.  On March 8, 2018, Steiner acknowledged that Plaintiffs had raised the removal of the Lab as a patient safety concern, including the resulting death of a patient, and stated that the lab would be moved back to the CCU.

### 3. Dangerous and/or Unnecessary Surgical Procedures

59.     Plaintiffs also raised patient safety issues with regard to unnecessary and dangerous cardiac medical procedures being performed by other physicians at the DMC.  Defendants' goal was to be profitable and medical procedures generated significant income for the DMC, paid by Medicaid and Medicare.  Thus, a legitimate medical basis for the procedures and the competency of the physicians preforming them were of less importance to Defendants than the generation of revenue.

60.     Plaintiffs brought concerns about physician competency and unnecessary and/or dangerous procedures to DMC leadership and to peer review meetings in order to ensure that the procedures, some of which resulted in deaths, be investigated.   Neither the physicians whose procedures were being questioned nor any of the Defendants welcomed the reports and peer review requests sought by Plaintiffs.   To the contrary, Plaintiffs demands for accountability led to complaints about them from the physicians at issue who were backed up by the DMC due to their generation of revenue by their faulty procedures, and later, to Plaintiffs' terminations.

61.     The medical concerns with regard to unnecessary and or dangerous procedures being performed raised by Plaintiffs included, but were not limited to the following:

-   In late 2015, a patient was admitted who suffered from PE. The patient did not medically qualify for aggressive PE intervention, and such intervention was medically unnecessary. In spite of this, and with the procedure being very complicated, two inexperienced physicians who were unable to identify the dangerous situation went forward with the intervention.  The patient suffered from complications and bled to death.

-   A patient died on February 22, 2016 when an unnecessary procedure was

14

performed on him. The patient did not meet appropriate criteria and did not fit clinical protocols for the procedure. Two more procedures were later performed on the patient based on the poor result, which created complications. Dr. Elder filed a written complaint with DMC Compliance. No response was received.

- Several patients were subjected to unnecessary carotid stent procedures, and some physicians created false dictation as to the percent of the blockage that existed in order to justify the procedure.

- In May of 2016, an 85-year-old demented patient died due to an unnecessary procedure being performed experimentally by physicians attempting the procedure for the first time.

- One physician, who is now under investigation by the FBI, performed a procedure without consent on a young female patient who died. The physician then tried to, and did, change and manipulate medical records to cover up the basis for the death. Dr. Elder tried on multiple occasions to bring this physician's dangerous practices to DMC's attention. In one written complaint he stated, "…DMC's lack of action against [this doctor] is ethically shocking to me. It is high time that DMC stop worrying about profits and stay focused on patient safety, compliance

…and longevity… I strongly believe we have a work environment that is not only increasingly difficult to work in, but more importantly a dangerous one for patients because of physicians…who believe there is no accountability."

62.     Defendants billed and continued to bill the government for these and other improper procedures.

## Fraud With Regard to Physician Coverage

63.     In 2017, Plaintiffs exposed a violation with regard to the DMC Cardiovascular Institute, which provided "Cardio Team One" ("CTO") on-call coverage to Detroit Receiving Hospital. Participating cardiologists were required to provide "Restricted On-Call Coverage" between 7:00 p.m. and 7:00 a.m. by being "present in the emergency department or on an inpatient unit within minutes from being called to evaluate and treat patients with ST elevation myocardial infarction…and other cardiac conditions."

64.     DMC advertised to the public via television, billboards, the internet, and radio that cardiologists were on site "24/7" to handle sudden heart attacks and other emergencies, a unique feature of their Heart Hospital, to encourage patients to use their services.

65.     However, certain cardiologists assigned to restricted on-call

coverage were being paid even though they were not in the emergency department or on a hospital unit; they were not even on the premises as required, thus negating the emergent, life-saving purpose of the restricted on-call coverage.  From 2016-2018, Plaintiffs reported this to Defendants both verbally and in writing.

66.     Based on Plaintiffs' continued complaints about unnecessary and dangerous procedures, unclean instruments, failure to provide CTO coverage 24/7 and other violations of the law, Tenet brought in a team of lawyers in the spring of 2017 to allegedly investigate the concerns raised.  In fact, the outside medical reviewer who had been retained found that many of the medical procedures *were* improper and medically unnecessary.  But there was no announcement of this and no discipline or terminations by Defendants. To the contrary, the hired legal team said the procedures were all proper.

67.     In April 2017, Plaintiffs expressed intense concern with regard to the medical quality assurance ("Q/A") meetings that resulted in cover-ups for poor medical outcomes.  Dr. Elder reported in writing that Defendants were "complicit" in facilitating a "toxic culture" of "enterprise before the patient."  Plaintiffs further reported that Q/A had members who were not "peers" and were unqualified to assess quality, and that qualified doctors who were experts had been intentionally excluded because they were advocates for patients and quality.

17

68.     In September 2017, Dr. Elder documented to Defendants his concerns that the absence of skilled nurses in the Cath Lab had reached a critical point, resulting in a "severe decrease in the quality of care."

**Defendants Retaliate Against and Terminate Plaintiffs**

69.     By 2017 Defendants had decided that they could no longer tolerate Plaintiffs reporting and refusing to acquiesce in legal and compliance violations as set forth above.

70.     By August 2018, Defendants sought a way to force Plaintiffs to resign, or if necessary, to terminate them.

71.     In September 2018, Plaintiffs received notification that Tenet had hired the outside law firm of Latham and Watkins to begin what was presented as an investigation into problems, raised in large part by Plaintiffs, at the DMC.  In fact, Defendants' real plan was to use this "investigation" to provide a cover for the pre-determined decision to force Plaintiffs out.

72.     As part of the so-called investigation, the Plaintiffs were interviewed by Latham and Watkins lawyers on September 18 and 19, 2018.  The lawyers told Plaintiffs that they had been given a deadline of October 1, 2018 to finish the investigation report.

73.     In late September 2018, Defendants pressured Plaintiffs to resign and

used threats to induce them to do so.  The effort failed.

74.    In response, on October 1, 2018, Dr. Elder sent an email to Defendants Tedeschi and Evans stating:

"I will not be extorted! It has come to my attention and surprise that this recent Tenet investigation is a [sham]. Many of the staff have expressed serious concerns of the 'true' motive. Many more have not been interviewed to speak up freely.  Your investigation wasn't about my years long complaints regarding patient safety. Rather you have been building a case to terminate my employment and privileges at DMC. You apparently are bent on also tarnishing my reputation that I have worked my entire life to earn. I realize Tenet is a large corporation whose primarily motivation is to make money and please its constituents. However, I am a physician and will never accept the fact they continue to put profits over patient safety and carry on as if it is simply the cost of doing business. Especially egregious is the disregard for human life, all humans regardless of their socio economic status are entrusting us. Tenet must change its ways and know it cannot get away with these policies even if it is against populations of less privilege and people of color.

I was led to believe that it [the Latham and Watkins investigation] was designed to address my concerns regarding quality, patient safety and vulnerable patients. It stead, it is obvious that it was designed to advance an agenda to silence [ ] patient advocates and 'kill the messengers.' This is clearly retaliation which is intent on punitive damage to those who place patients over profits. Tarnishing my good reputation will not advance Tenet leadership, nor change the facts regarding patient safety.  I am in complete protest of this investigation, it was an excuse to find a way to silence the advocates and not address the patient quality and safety concerns at DMC-Tenet hospitals." [typographical errors in the original].

75.    Later on October 1, 2018, both Plaintiffs were abruptly terminated.

As of that time, and throughout their employment with the Defendants, Plaintiffs

had excellent reputations in the medical community, no record of any policy violation or wrongdoing, no administrative complaints by a state agency, no malpractice lawsuits and no patient complaints.

### Defendants Intentionally Disparage Plaintiffs and Publicly Place Them in a False, Negative Light

76.   Plaintiffs were provided with no advance notice of their termination. To this day Plaintiffs have not been provided with any specific reason for their terminations.  Just one month earlier DMC leadership was publically praising Plaintiffs for their medical performance in saving lives.

77.   October 1, 2018, Defendants gratuitously announced Plaintiffs' terminations with great fan-fare and a media roll-out for public consumption. Defendants falsely told the media that Plaintiffs had been terminated for unspecified "violations" of the "Tenet Standards of Conduct" and unspecified "complaints."

78.   Defendants stated that their "investigation" had supplied a rationale for the terminations.  But as of today's date, and in spite of multiple attempts by Plaintiffs to obtain it, the investigation report has never been produced to them, and the "complaints" have not been identified.

79.   In addition, also on October 1, 2018, Defendants sent to approximately 5,000 DMC physicians, nurses, and employees an email stating that

Plaintiffs had been terminated for unspecified "violations of our standards of conduct."

80.    Defendants' statements to the media, DMC physicians and the public were designed to place Plaintiffs in a false, negative light and to ruin their reputations as retaliation for their complaints about and refusal to acquiesce in illegal actions, refusal to resign from their positions, and to ensure that plaintiffs were unable to continue to observe their illegal activities.

81.    Dr. Elder responded publicly to Defendants false public statements, stating, in pertinent part:

> "My reputation as a top cardiologist speaks for itself. No pretextual email sent by Tenet will diminish my long accolades. Ironically, Tenet is trying an age-old tactic of trying to diminish and discredit the messenger. I was a top doctor (at DMC) for 10 years. ... Now that I refuse to stay quiet about safety concerns, they respond in highly inappropriate and unprofessional manner."

82.    At the time of the terminations Defendant Steiner falsely told the media:

> "It would be inappropriate for the DMC to discuss the particulars of Standards of Conduct violations by individual doctors… Any suggestion that these leadership transitions were made for reasons other than violations of our Standards of Conduct is false. The leadership transition is the result of a thorough review led by outside counsel into complaints from other physicians and team members. The review found that our Standards of Conduct had been violated and we took appropriate action."

**Defendants Retaliate Against Plaintiffs Post-Termination, Including Removing Their Privileges to Practice at the DMC**

83.     Based on Plaintiff's ongoing complaints about fraud and safety while still employed as Directors, Dr. Elder's public response to the terminations including that he refused to "stay quiet about safety concerns," and Dr. Kaki's fight to obtain his personnel record (addressed below), Defendants retaliated against Plaintiffs in their roles as on-call Cardio Team One cardiologists and staff physicians.

84.     Defendants retaliated against Plaintiffs by prohibiting them from participating in Peer Review and Quality Assurance Committees. The only cardiologists restricted from participating in quality committees and sub-committees were the Plaintiffs.  DMC changed the entire process of quality assurance to the exclusion of Plaintiffs in order to stop their strong advocacy for patient safety and critic of bad operators with bad outcomes.

85.     The retaliation included, but is not limited to: revocation of DMC email, removal of pagers, prohibition on teaching and/or giving lectures, removal from the Fellowship Faculty, removal from Director positions, failure to refer patients to them, attempts to steal Plaintiffs patients who visit the ER, disparagement of them and a prohibition on serving on subcommittees in Peer Review.

22

86.     On March 25, 2019, Plaintiffs filed a federal lawsuit against Defendants for violations of the above and below referenced claims.

87.     The suit earned significant media attention and Plaintiffs' claims were covered by the Detroit Free Press, the Detroit News, Crains and other media outlets.

88.     On April 29, 2019, in a letter signed by Dr. Levy, and in conjunction with Dr. Tedeschi, Plaintiffs were advised that their privileges to practice medicine at the DMC were not being renewed.

89.     Defendants subsequently notified all DMC departments that Plaintiffs had lost their privileges.

90.     On May 6, 2019, Defendants sent Plaintiffs a letter reminding them that "[they] [were] no longer on the DMC medical staff," and demanding that the pagers issued to them and their practice groups in connection with their memberships on the DMC medical staff be immediately returned. DMC "deactivate[d] all of [the] pagers at 5:00 pm eastern on Wednesday, May 8, 2019."

91.     The procedures Defendants used with regard to the failure to renew Plaintiffs' clinical privileges were unusual and contrary to those outlined in the DMC Medical Bylaws; and Defendants did not provide Plaintiffs with the procedures required prior to taking action against them, including, but not limited

to, making an "objective and evidence-based decision."

92.     Pursuant to these Bylaws, "[a]ll decisions regarding membership and privileges shall be made by the Governing Body in accordance with the procedures described in Medical Staff Policy.  The Governing Body shall act only after there has been a recommendation from the Medical Executive Committee (MEC)."

93.     Upon information and belief, the Medical Executive Committee ("MEC") voted in favor of renewing Plaintiffs' privileges, a decision that was overturned by Defendant Tenet's and DMC's executives, including the Defendants named herein, and the Joint Committee Council ("JCC").

94.     Such an action is very rare if not unprecedented.

95.     All four reasons cited in Defendants' April 29, 2019 letter for not renewing Plaintiffs' clinical privileges were pretextual.  Plaintiffs never received a single written communication regarding any problems with their performance or explaining why their privileges were at issue.

96.     Defendants became obsessed with preventing Plaintiffs from continuing to report and refuse to acquiesce in illegal actions to remove Plaintiffs from all the DMC buildings so that they were unable to view and point out illegal actions and to ruin Plaintiffs' careers as retaliation for their reporting and filing this lawsuit.

24

**Defendants Withhold Personnel Record,
Including Alleged Reasons for Terminations**

97.    Shortly after being terminated, Dr. Kaki contacted Defendants and requested his personnel record, pursuant to the Bullard-Plawecki Employee Right to Know Act, MCL § 423.501, *et. seq*., in order to obtain the Standard of Conduct "violations," "review," "complaints" and/or "investigation" Defendants publicly stated they relied on for his termination.

98.    MCL § 423.510 defines "personnel record" as "a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action."

99.    Defendants refused Dr. Kaki's request, taking the legally unsupportable position that in his role as the Director of the Cardiac Catherization Unit he was not an "employee" of the DMC or any DMC Hospital and therefore was not entitled to his own personnel record.

100.    Dr. Kaki was forced to file a lawsuit in Wayne County Circuit Court to obtain his personnel record pursuant to MCL § 423.501, *et. seq*. Desperate to keep the "investigation" away from him, Defendants hired lawyers to appear in Court to argue that Dr. Kaki should not be able to obtain his personnel record, including the as yet unspecified reasons for his firing.  Defendants sought and

continue to seek to make false public statements about Plaintiffs with regard to an "investigation," and "violations," while refusing to hand over any evidence thereof.

101. The Wayne County Circuit Judge granted Dr. Kaki's motion to obtain his file; Defendants then appealed to the Michigan Court of Appeals. The Appellate Court sent the case back to the lower court to have the parties engage in discovery in order to determine Dr. Kaki's status as an "employee." Dr. Kaki then dismissed the Wayne County case without prejudice and was forced to file this case without the ability to first review the alleged reasons, if any, for his termination.

102. Pursuant to state and federal law, and based upon their job descriptions, created by Defendants, and their leadership roles, Dr. Kaki and Dr. Elder were clearly "employees."

103. Defendants falsely claim that Plaintiffs are "independent contractors," although neither Plaintiff would be considered as such under state or federal law.

104. In fact, Defendants have intentionally misclassified Plaintiffs – and likely others – under the law as "independent contractors" and insisted that they sign agreements to that effect in order to obtain employment, in violation of state and federal law.

105. All of the above described retaliation is designed to further harm

26

Plaintiffs and to pressure them to surrender their staff privileges, keeping them completely away from DMC.

## C. LEGAL CLAIMS

### COUNT I
### VIOLATIONS OF THE RETALIATION PROVISION OF
### THE FALSE CLAIMS ACT, 31 U.S.C. § 3730

106.   Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

107.   The retaliation provision of the False Claims Act ("FCA") protects any employee, contractor or agent from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

108.   Relief for violating 31 U.S.C. § 3730(h)(1) includes reinstatement of the employee, contractor, or agent with the same level of seniority that person would have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, and special damages. Relief also includes reasonable attorneys' fees. *Id.* § 3730(h)(2).

27

109.   On numerous occasions, Plaintiffs engaged in lawful acts, as set forth in more detail above, in efforts to stop 1 or more violations of the FCA, including but not limited to, 31 U.S.C. §§ 3729(a)(1)(B), 3729(a)(1)(G), 3729(a)(1)(A) and 3729(a)(1)(C), by all the Defendants and others associated with DMC.

110.   The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

111.   Plaintiffs cannot at this time identify each and every false claim for payment that was caused by Defendants' conduct, as the claims have been presented by several separate entities and Plaintiffs do not have access to the records of all such false or fraudulent statements, records or claims.

112.   Plaintiffs were subsequently retaliated against, terminated and retaliated against post-termination due to their protected activity.

113.   As a direct and proximate cause of Defendants' conduct of improperly retaliating against, investigating and terminating Plaintiffs, they have suffered damages including, but not limited to, loss of their jobs and income, loss of career opportunities, emotional distress, including, but not limited to, embarrassment, humiliation and outrage.

## COUNT II
## VIOLATION OF THE MICHIGAN MEDICAID
## FALSE CLAIMS ACT, MCL § 400.610c

114.    Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

115.  The Michigan Medicaid False Claims Act ("Michigan Medicaid FCA") is an act "to prohibit fraud in the obtaining of benefits or payments in connection with the medical assistance program; to prohibit kickbacks or bribes in connection with the program; to prohibit conspiracies in obtaining benefits or payments; . . . to provide for civil actions to recover money received by reason of fraudulent conduct; . . . to prohibit retaliation; to provide for certain civil fines; and to prescribe remedies and penalties." Michigan Medicaid False Claim Act 72 of 1977. (Emphasis added).

116.    Additionally, "[a]n employer shall not discharge, demote, suspend, threaten, harass, or in any other manner, discriminate against an employee in the terms and conditions of employment because the employee engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists in an investigation under this act." MCL § 400.610c.

117.    An employer who violates this section is liable to the employee for all

29

of the following:

    (a)  Reinstatement to the employee's position without loss of seniority;

    (b)  Two times the amount of lost back pay;

    (c)  Interest on the back pay;

    (d)  Compensation for any special damages; and

    (e)  Any other relief necessary to make the employee whole. MCL § 400.610c(2).

118.  Over Plaintiffs' stated reports and objections, Defendants, through their own acts or the acts of their officers, knowingly made, used or caused to be made or used, a false statement or false representation of a material fact in an application for Medicaid benefits to get false or fraudulent claims paid or approved by the State of Michigan in violation of MCL § 400.603(1).

119.  Plaintiffs cannot at this time identify every false statement or false representation of a material fact made in applications for Medicaid benefits that was caused by Defendants' conduct, as the applications have been made by several separate entities and Plaintiffs do not have access to the records of all such false or fraudulent statements, records, claims or applications.

120.  Plaintiffs took lawful acts in furtherance of an action under the Michigan Medicaid FCA with regard, but not limited to, MCL § 400.603.  They, on numerous occasions, reported and objected to Defendants' violations of this

Act, as set forth in more detail above.

121.   Defendants and others associated with Defendant DMC retaliated against Plaintiffs' and terminated them due to their reports of violations of the Michigan Medicaid FCA.

122.   Such conduct was in violation of the Michigan Medicaid False Claims Act, MCL §400.610c.

123.   The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

124.   As a direct and proximate cause of Defendants' conduct of improperly retaliating against, investigating and terminating Plaintiffs, they have suffered damages including, but not limited to, loss of their jobs and income, loss of career opportunities and emotional distress, including, but not limited to, embarrassment, humiliation and outrage.

## COUNT III
## RETALIATORY DISCHARGE IN VIOLATION OF
## PUBLIC POLICY OF THE STATE OF MICHIGAN

125.   Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

126.   As described above, Plaintiffs exercised their rights and otherwise

engaged in protected activity by exercising their responsibility to raise concerns, both verbally and in writing, and refusing to acquiesce in of violations, or suspected violations, of state and/or federal laws related to federal health care programs and state and/or federal laws, as set forth above.

127.   In addition, Defendants must meet the minimum standards and rules of the Michigan Public Health Code and must endeavor to carry out practices that will further protect the public health and safety, prevent the spread of disease, alleviate pain and disability, and prevent premature death.

128.   Furthermore, MCL § 333.21513 states that the owner, operator, and governing body of a hospital are responsible for all phases of the operation of the hospital, selection of the medical staff, and quality of care rendered in the hospital.

129.   By virtue of the acts described in the preceding paragraphs, Defendants have violated the Michigan Public Health Code and Plaintiffs refused to acquiesce in the violations.

130.   Defendants are also in violation of the State of Michigan's Department of Licensing and Regulatory Affairs' Minimum Standards for Hospitals, R 325.1001, *et. seq*.

131.   Per R 325.1024, which pertains to the sterilization of instruments and utensils, Defendants are required to do the following: (1) make arrangements for

the laundering of linens and other washable goods; 2) have provisions for the sterilization of dressings, utensils, instruments, and water; (3) maintain a check on the performance of all sterilizing equipment; and (4) take special precautions so that sterile supplies may not be mixed with unsterile supplies.

132.   Defendants have violated the Public Health Code and State of Michigan's Minimum Standards for Hospitals and Plaintiffs refused to acquiesce in the violations.

133.   The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants has been damaged in an amount to be determined.

134.   Defendants, through their agents, servants, or employees, violated the public policy of the State of Michigan by retaliating against Plaintiffs and terminating them for engaging in the above referenced protected activity.

135.   Defendants' actions were intentional, with reckless indifference to Plaintiffs' rights and sensibilities.

136.   The temporal proximity between Plaintiffs' protected activity and Defendants' materially adverse employment action is also a clear indicator of retaliatory conduct.

**COUNT IV**
**RETALIATORY REMOVAL OF CLINICAL PRIVILEGES**
**IN VIOLATION OF PUBLIC POLICY OF THE STATE OF MICHIGAN**

137.   Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

138.   As described above, Plaintiffs exercised their rights and otherwise engaged in protected activity by exercising their responsibility to raise concerns, both verbally and in writing, and refusing to acquiesce in of violations, or suspected violations, of state and/or federal laws related to federal health care programs and state and/or federal laws, as set forth above.

139.   Defendants, through their agents, servants, or employees, violated the public policy of the State of Michigan by retaliating against Plaintiffs and not renewing their clinical privileges.

140.   Defendants' actions were intentional, malicious, occurred with reckless indifference to Plaintiffs' rights and sensibilities and were designed as retaliation for the aforesaid actions and for filing a federal lawsuit against them on March 25, 2019.   They were also done with the purpose of removing Plaintiffs from the DMC properties so that they could no longer view and point out Defendants' illegal activities.

141.   The temporal proximity between Plaintiffs' protected activity and

Defendants' materially adverse employment action is also a clear indicator of retaliatory conduct.

## COUNT V
## FALSE LIGHT

142.   Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

143.   On October 1, 2018, Defendants alerted the media and called a public press conference to announce the termination of Plaintiffs.

144.   Plaintiffs were identified by name and title by Defendants at the press announcement.

145.   Defendants falsely stated that Plaintiffs had violated the Tenet Standards of Conduct based on an "investigation," and insinuated that the violations were so serious that they could not provide the "particulars."

146.   Defendants further falsely stated that "[a]ny suggestion that these [termination decisions] were made for any reasons other than violations of our Standards of Conduct is false."

147.   Also on October 1, 2018, Defendants emailed 5,000 DMC employees falsely stating that Plaintiffs had engaged in misconduct and had to be terminated.

148.   After Plaintiffs attempted to correct the record as to the reason for their terminations to the public, on October 8, 2018, Tenet and Tedeschi falsely

35

stated that Plaintiffs had made false statements because they were "disgruntled." Tedeschi falsely claimed that a "thorough review" had been conducted proving that Plaintiffs and violated the Standards of Conduct.

149.   After creating the publicity and media attention with regard to the terminations, Tedeschi falsely called the response from Plaintiffs and coverage thereof "external noise."

150.   At the time of their terminations Plaintiffs had never received any discipline of any kind.

151.   After the termination, Dr. Kaki sought to obtain his personnel record in order to obtain the reason for his termination, including the results of the "investigation" referred to by Tedeschi and the specific evidence of his having violated the Standards of Conduct.  Defendants refused to provide the record.

152.   Defendants' had knowledge of or acted in a reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs were placed.

153.   The statements were unreasonable, highly offensive and were designed to harm Plaintiffs' reputations and career opportunities.

154.   Defendants' public statements were made with actual malice.

155.    As a direct and proximate cause of Defendants' false remarks,

Plaintiffs have suffered damages including, but not limited to, damage to their reputations, loss of their jobs and income, loss of career opportunities and emotional distress, including, but not limited to, embarrassment, humiliation and outrage.

## COUNT VI
## VIOLATION OF THE BULLARD-PLAWECKI
## EMPLOYEE RIGHT TO KNOW ACT, MCL § 423.501, *et. seq*.
### (*as to Dr. Kaki*)

156.   Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

157.   At all times material hereto, Plaintiff Kaki was an employee and Defendant DMC was an employer covered by and within the meaning of the Bullard-Plawecki Employee Right to Know Act, MCL § 423.501, *et. seq*.

158.   The primary purpose of the Bullard-Plawecki Employee Right to Know Act ("the Act") is to establish an employee's right to examine his personnel records, i.e. "the documents that are being kept by the employer concerning that employee."

159.   Per the Act, "Employer" means an individual, corporation, partnership, labor organization, unincorporated association, the state, or an agency or a political subdivision of the state, or any other legal, business, or commercial entity which has 4 or more employees and includes an agent of the employer.

37

MCL § 423.501(2)(b).

160.   Per the Act, "Personnel record" means a record kept by the employer that identifies the employee to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action. MCL § 423.501(2)(c).

161.   Defendant DMC generated and maintained personnel record on Plaintiff Dr. Kaki during the course of his employment with Defendant.

162.   Defendant's records allegedly contain an "internal report" or other material which purports to set forth the reasons for Plaintiff's termination.

163.   According to Defendants, the "internal report" consists of an investigation by an outside law firm and the results thereof.

164.   Plaintiff repeatedly requested, but was denied by Defendant, access to a complete copy of his employment records.

165.   To date, Defendant and its employees continue to willfully fail and/or refuse to comply with the Act and Plaintiff's demands for a complete copy of his personnel record(s), including the "internal report."

166.   Specifically, Defendant, while refusing to provide Plaintiff with a copy of the "internal report" or his personnel record(s), has casted Plaintiff in a

negative light through its statements – those made publicly and to the media – regarding the cause for Plaintiff's termination, including that Defendant relied on an "internal report" for said termination.

167.   Defendant's intentional noncompliance with the Act threatens grave and irreparable harm to Plaintiffs' reputation, future employment opportunities and his legal rights.

## COUNT VII
## POST-TERMINATION RETALIATION AND
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC
## ADVANTAGE AND BUSINESS RELATIONSHIPS

168.   Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

169.   Dr. Kaki has had clinical privileges with the DMC since 2012.  Dr. Elder has had clinical privileges at the DMC since 2008.

170.   On April 29, 2019, in a letter signed by Dr. Levy, and in conjunction with Dr. Tedeschi, Plaintiffs were advised that their privileges to practice medicine at the DMC were not being renewed.

171.   The procedures Defendants used with regard to the removal of Plaintiffs' clinical privileges were unusual and contrary to those outlined in the DMC Medical Bylaws.

172.   All four reasons cited in Defendants' April 29, 2019 letter for not

renewing Plaintiffs' clinical privileges were pretextual.  Plaintiffs never received a single written communication regarding any problems with their performance or explaining why their privileges were at issue.

173.   Plaintiffs had a legitimate and reasonable expectation of future business opportunities and economic benefit from their leadership positions and work at the DMC.

174.   Defendants had knowledge of such opportunities and economic benefit and intentionally interfered with them by suspending and revoking Plaintiffs' clinical privileges.

175.   The removal of privileges occurred as further retaliation against Plaintiffs for their actions described above, and was done to literally remove them from the DMC properties so that they could no longer view and have the ability to report Defendants' illegal actions.

176.   Defendants committed these tortious acts with deliberate and actual malice, ill-will and conscious disregard of Plaintiffs' rights.

177.   Removal of privileges is the most devastating action a hospital can take with regard to a physician and his or her career.

178.   Defendants' actions have disrupted and damaged Plaintiffs' relationships, business opportunities and professional lives and careers.

179.   By intentionally removing Plaintiffs' clinical privileges without good cause and in retaliation, Defendants have tortuously interfered with their prospective economic advantage and business relationships at the DMC and other hospitals.

**COUNT VIII**
**INENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

180.   Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

181.   As described above, Plaintiffs exercised their rights and otherwise engaged in protected activity by exercising their responsibility to raise concerns, both verbally and in writing, and refusing to acquiesce in of violations, or suspected violations, of state and/or federal laws related to federal health care programs and state and/or federal laws, as set forth above.

182.   Defendants retaliated against Plaintiffs by not renewing their clinical privileges because they engaged in the above referenced protected activity and filed a federal lawsuit against them.

183.   Defendants' actions were intentional, malicious, extreme, outrageous, occurred with reckless indifference to Plaintiffs' rights and sensibilities and were designed as retaliation for the aforesaid actions and for filing a federal lawsuit on March 25, 2019. They were also done with the purpose of removing Plaintiffs from

41

the DMC properties so that they could no longer view and point out Defendants'
illegal activities.

184.   Plaintiffs have suffered severe and significant emotional distress as a
result of their loss of clinical privileges.

185.   As a further direct and proximate result of Defendants' wrongful acts,
Plaintiffs have sustained injuries and damages including but not limited to: loss of
earnings and earning capacity; loss of career opportunities; loss of fringe benefits;
mental anguish; anxiety about their futures, physical and emotional distress,
humiliation and embarrassment; loss of professional reputation; damage to their
good name and reputation; and loss of the ordinary pleasures of everyday life,
including the right to pursue gainful employment of their choice.

## **RELIEF REQUESTED**

For all the foregoing reasons, Plaintiffs demand judgment against
Defendants as follows:

### A.   **LEGAL RELIEF**

1.   Economic, noneconomic and compensatory damages in
whatever amount they are found to be entitled;

2.   Exemplary damages in whatever amount they are found to be
entitled;

3.   Punitive damages in whatever amount they are found to be
entitled;

42

4.      Liquidated damages, treble damages, and double damages in whatever amount they are found to be entitled; and

5.      An award of interest, costs and reasonable attorney fees.

## B.    EQUITABLE RELIEF

1.      An order from this Court placing Plaintiffs in the position they would have been in had there been no wrongdoing by Defendants, including reinstatement with back pay;

2.      An injunction out of this Court prohibiting any further acts of wrongdoing;

3.      An Order requiring Defendants to immediately produce Dr. Kaki's personnel records;

4.      An award of interest, costs and reasonable attorney fees; and

5.      Whatever other equitable relief appears appropriate at the time of final judgment.

Dated: June 4, 2019                    Respectfully submitted,

                              **DEBORAH GORDON LAW**
                              /s/Deborah L. Gordon (P27058)
                              Attorneys for Plaintiffs
                              33 Bloomfield Hills Parkway, Suite 220
                              Bloomfield Hills, Michigan 48304
                              (248) 258-2500
                              dgordon@deborahgordonlaw.com

## <u>JURY DEMAND</u>

Plaintiffs Drs. Amir Kaki and Mahir Elder by and through their attorneys

Deborah Gordon Law, demands a trial by jury of all the issues in this cause.

Dated: June 4, 2019                          Respectfully submitted,

                                             **DEBORAH GORDON LAW**
                                             <u>/s/Deborah L. Gordon (P27058)</u>
                                             Attorneys for Plaintiffs
                                             33 Bloomfield Hills Parkway, Suite 220
                                             Bloomfield Hills, Michigan 48304
                                             (248) 258-2500
                                             dgordon@deborahgordonlaw.com